# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
TOZZI, CAMPANELLA, and CELTNIEKS
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist NELS F. JACKSON**
**United States Army, Appellant**

ARMY 20120159

Headquarters, Fort Hood
Kirsten V.C. Brunson, Military Judge
Colonel Stuart W. Risch, Staff Judge Advocate (pretrial)
Colonel Richard W. Rousseau, Staff Judge Advocate (post-trial)

For Appellant: Captain Patrick J. Scudieri, JA (argued); Colonel Kevin Boyle, JA; Major Vincent T. Shuler, JA; Captain Patrick J. Scudieri, JA (on brief); Captain Michael J. Millios, JA.

For Appellee: Captain Jaclyn E. Shea, JA (argued); Colonel John P. Carrell, JA; Major John K. Choike, JA; Captain Jaclyn E. Shea, JA (on brief).

18 May 2015

------------------------------------
OPINION OF THE COURT
------------------------------------

TOZZI, Senior Judge:

A panel of officer and enlisted members convicted appellant, contrary to his pleas, of one specification of conspiracy to violate a lawful order, one specification of willful disobedience of a superior commissioned officer, and two specifications of abusive sexual contact with a child, in violation of Articles 81, 90, and 120, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 881, 890, 920 (2006 & Supp. III 2010). The panel sentenced appellant to a dishonorable discharge and four years confinement. The convening authority approved the adjudged sentence.

This case is before us for review pursuant to Article 66, UCMJ. Appellant raises five issues, two of which merit discussion and relief.[1] First, we hold that a

---

[1] The matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), do not warrant relief.

U.S. Army Criminal Investigation Command (CID) agent's testimony constituted impermissible human lie detector testimony and that this error materially prejudiced appellant's substantial rights. Second, in light of this prejudicial error, appellant suffered a deprivation of his due process rights when it took 739 days from the end of appellant's trial until the convening authority took action in the case.

## BACKGROUND

### a. Appellant's Criminal Convictions

Appellant was convicted of twice touching his stepdaughter's genitalia through her clothing at or near Fort Hood, Texas, when she was fifteen years old.[2] Appellant's stepdaughter, HJ, testified about the first incident, and stated appellant began scratching her back while he sat on the couch and she lay down on the couch with her head in her hands propped up on appellant's right thigh as the two watched a movie. Appellant's scratching moved closer and closer to HJ's breasts and buttocks. HJ testified that "it got to a point where there was no doubt that it was inappropriate because he was just going too far." Appellant then began touching HJ's breasts, buttocks, and vaginal area. This incident occurred between 6 November 2010 and 25 December 2010.

HJ could not remember the second incident.[3] However, as described in greater detail below, at trial the government introduced appellant's confession to both the first incident and this second incident, along with two photographs corroborating the confession to the second incident. Appellant was also convicted of conspiring to violate a no-contact order and willfully disobeying that no-contact order.

### b. Testimony of Special Agent K-O

The government called Special Agent (SA) K-O from CID to testify about appellant's confession and the circumstances surrounding her interview and

---

[2] One of the central issues of the trial was the credibility of appellant's step-daughter, HJ. She admittedly recanted the allegations against appellant several times, primarily because her mother did not believe HJ's allegations and removed privileges from HJ unless she recanted the allegations. HJ also testified that her mother committed her to a mental institution and would not authorize her release until she recanted her allegations, which HJ did in order to leave the facility.

[3] The government also introduced evidence under Military Rule of Evidence 414 of appellant inappropriately touching HJ before he entered the Army. As part of this evidence, the government introduced a statement by appellant to a civilian police officer where he stated that he did not inappropriately touch HJ, but that she rolled onto his hand while sleeping and "started moving in . . . a dry humping motion."

interrogation of appellant. In her opening statement, the trial counsel told the panel that SA K-O would testify that during appellant's confession, his demeanor changed and "it was almost as if he was reliving it."

In describing her professional qualifications, SA K-O told the panel she was "a graduate of the National Center for Credibility Assessment." She described the school as teaching "master's level courses in psychology and psychophysiology," and she was trained to study verbal and nonverbal signs of deception, as well as written statements for signs of deception. Special Agent K-O testified that personnel from agencies such as the CIA, DIA, and Secret Service receive training at the National Center for Credibility Assessment.

Next, SA K-O explained the difference between interviews and interrogations, where an interview is a fact-gathering exercise and an interrogation is designed to elicit incriminating responses. Special Agent K-O testified that not all interviews become interrogations, explaining when the interviewer does not believe "there are signs of deception," there is no need for the interviewer to transition to an interrogation. Special Agent K-O then went into considerable detail describing various verbal and nonverbal signs of deception.

A significant portion of SA K-O's testimony was aimed at rebutting any inference that appellant's confession was false, coerced, or otherwise involuntarily made. Special Agent K-O discussed factors that could lead to false confessions, such as hunger, sleep deprivation, lengthy interrogations, yelling, and threatening. She then described how those conditions were not present in appellant's case.

After describing her initial interaction with appellant, SA K-O then testified about how she observed his "verbal and nonverbal body language." In doing so, she used "shock-absorbing questions" to help her "gauge what [his] verbal and nonverbal signs of deception are." She further described shock-absorbing questions as "questions that most people would display verbal and/or nonverbal signs of deception when answering." Special Agent K-O stated one shock-absorbing question might be, "[h]ave you ever engaged in any abnormal sexual activity with an adult female," where abnormal sexual activity means anything other than missionary position. According to SA K-O, most people answering "no" to that question would display some verbal and nonverbal signs of deception.

Special Agent K-O testified that she initially interviewed appellant – and was not interrogating him. During the interview portion, she posed shock-absorbing questions to appellant. For example, she asked questions such as, "[d]id you ever engage in any abnormal sexual activity with an adult female? Did you ever engage in any sexual activity that you are ashamed of with an adult female? And did you ever participate in any abnormal sexual activity with an adult female that you haven't told me about?" When asked how well appellant answered, she said "[n]ot

3

well." After fifty minutes of interviewing appellant, SA K-O stated she transitioned to an interrogation phase. She told appellant "it appeared that he wasn't telling the truth about what happened with his stepdaughter." Appellant continued to deny any wrongdoing against his stepdaughter.

After some time, appellant gradually admitted to SA K-O he touched his stepdaughter. In describing appellant's demeanor, SA K-O said, "it wasn't the same outgoing, talkative guy before [sic]. His voice was lowered. He had this faraway look in his eyes and he was just describing the whole thing. It was strange." Special Agent K-O described in great detail how appellant admitted to sitting on a couch as HJ lay next to him on the couch while watching a movie and touching HJ's breasts, buttocks, and vagina. She described appellant as "talking about his hand like it was separate from him. And he got this really like faraway look in his eyes like he was reliving it." Appellant also placed his hand on SA K-O's hand to demonstrate how lightly he touched his stepdaughter. Then, regarding the second incident, appellant also admitted to lifting up HJ during a Christmas photo shoot and touching her vagina through her clothing and that he became sexually aroused from it. Special Agent K-O then stated, "[o]nce we got all of the information . . . he felt really bad. He said that he felt like a monster." According to SA K-O, appellant was crying and very remorseful. Appellant later reduced his confession to writing, which was admitted into evidence. This confession was consistent with his oral confession, and appellant further admitted to masturbating twice when thinking about what happened between him and HJ.

At trial, appellant never raised the issue of human lie detector testimony from SA K-O. Trial defense counsel extensively cross-examined SA K-O. For example, SA K-O agreed that some verbal and nonverbal signs of deception do not necessarily mean someone is actually being deceptive. Special Agent K-O also admitted she knew appellant had only three hours of sleep within the previous twenty-four hours, and that appellant was experiencing pain in his right side, but "he acted like it was no big deal." Additionally, SA K-O testified the last time appellant ate was dinner the night before and that her session with him lasted from 0940 until 1630. Special Agent K-O explained she does an "assessment" to determine whether someone is physically and mentally capable of going forward. Special Agent K-O also testified she was aware of a previous denial made by appellant earlier to another CID agent.

Further, on cross-examination, SA K-O testified she told appellant she did not believe his denials as she transitioned from interview to interrogation mode. Trial defense counsel questioned SA K-O regarding her use of shock-absorbing questions. For example, trial defense counsel asked:

> Q: Okay, but when he answered that [shock-absorbing]
> question in that fashion, he said, "No, I don't engage in
> abnormal sexual behavior." And he said no, did you take

4

that as him not telling the truth that he has engaged in sexual acts with his wife that are in the non-missionary position?

A: Yes, sir.

Q: I am asking how you interpreted that.

A: I interpreted that as being untruthful, yes, sir.

On re-direct, SA K-O discussed why she cut off appellant's denials early during the interrogation. "Usually the stages are denial, first where they are saying I didn't do it, and then, they move to the objections . . . . And then, admissions – the next stage is admissions where they are saying, 'Okay. I did this part, but not the other part. I did one thing, but not the other' . . . . And then, ultimately, the confession . . . . And if they are exhibiting behavior that leads us to believe otherwise, we cut off their denials . . . ." Near the end of the re-direct examination, SA K-O described her perception of appellant:

> My perception was just what I said earlier that he was like reliving it. He was sitting there telling me what he had done and the way he was looking off into the distance he was remembering what had happened. He was not looking off into the distance because he felt like he was hungry or, you know, falling asleep. He was being very actively engaged and appeared to be remembering what had happened.

At that point, trial defense counsel objected "to the first part of [SA K-O's] answer. Complete speculation as to what ---- " The military judge sustained the objection before the counsel finished. The military judge did not further instruct the panel about that statement.[4] Trial counsel then ended her re-direct examination with one more question:

> Q: [SA K-O], speaking only to what you could observe and not necessarily what you thought he was thinking at the time, what were you basing your perception on in terms of what you observed?
>
> A: I mean, in my training and experience I have talked to a lot of people, who are telling me things that they've

---

[4] Earlier in the trial, the military judge had properly instructed the panel to disregard respective questions and answers once an objection is sustained.

> done that they're not happy about or proud of and when
> they're telling me the things that they've done and they're
> looking off into the distance as they are doing it, it is my
> perception that -- it is just talking to somebody. You can
> tell when they're recounting events and they are
> verbalizing them to you, that's what was going on.

The military judge did not specifically instruct the panel about SA K-O's purported human lie detector testimony. The military judge did provide the general credibility instruction to the panel immediately after the court assembled and before deliberation on findings. The military judge also instructed the panel regarding the testimony of a Child Protective Services supervisor that "[t]o the extent you believed the CPS supervisor . . . testified or implied that she believes the alleged victim, or that a crime occurred, you may not consider this as evidence that a crime occurred or that the alleged victim is credible."

### c. Dilatory Post-trial Processing

Appellant's sentence was adjudged on 12 February 2012. The convening authority did not take action until nearly two years later, on 23 January 2014. Trial defense counsel asserted appellant's right to speedy post-trial processing nine times before transcription of the record was complete and the military judge authenticated the record. Appellant's mother personally requested the convening authority for assistance in, among other things, speedy post-trial processing. Appellant filed a motion with the military judge requesting relief for the slow pace of post-trial processing, which the military judge denied. The government concedes only twenty days are attributable to the defense.

### LAW AND DISCUSSION

### a. Special Agent K-O's Human Lie Detector Testimony

"It is 'the exclusive province of the court members to determine the credibility of witnesses.'" *United States v. Knapp*, 73 M.J. 33, 34 (C.A.A.F. 2014) (quoting *United States v. Brooks*, 64 M.J. 325, 328 n.3 (C.A.A.F. 2007)). Our superior court "has been resolute in rejecting the admissibility of so-called human lie detector testimony, which we have described as: 'an opinion as to whether the person was truthful in making a specific statement regarding a fact at issue in the case.'" *Brooks*, 64 M.J. at 328 (quoting *United States v. Kasper*, 58 M.J. 314, 315 (C.A.A.F. 2003)); *see also Knapp*, 73 M.J. at 36. "If a witness offers human lie detector testimony, the military judge must issue prompt cautionary instructions to ensure that the members do not make improper use of such testimony." *Kasper*, 58 M.J. at 315.

Because appellant did not raise a human lie detector objection to SA K-O's testimony, we review his claim on appeal for plain error. Under a plain error analysis, appellant has the burden of proving "(1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights." *Brooks,* 64 M.J. at 328. The Supreme Court has defined error as "[d]eviation from a legal rule . . . unless the rule has been waived." *United States v. Olano*, 507 U.S. 725, 732-33 (1993).[5]

We must analyze SA K-O's testimony in light of our superior court's recent decision in *Knapp*. In that case, SA P, an agent from the Air Force Office of Special Investigations (AFOSI), questioned Knapp about having sex with Airman First Class (A1C) ES, who allegedly was too drunk to be conscious or consent. 73 M.J. at 34. Special Agent P testified that agents are "trained to pick up on nonverbal discrepancies . . . . Early on in the interview the accused would not make eye contact with me when we were talking about the sexual intercourse portion." *Id.* at 35. Special Agent P further explained:

> That is indicating to me that there is some form of deception going on. Prior to the intercourse, the accused was very detailed, very detail oriented, would look me in the eye, talk to me, and as soon as we got to the intercourse he would look away, look at the wall, look at the floor, not look at [the agents], and then immediately after the sexual intercourse timeframe he would kind of come back to us and be, once again, extremely detailed . . . [l]ater on we had to ask him open-ended questions to try to get the truth out from him.

*Id.* On cross-examination, SA P was asked why the interview did not end after Knapp repeatedly stated A1C ES was awake and willing when they began to have sexual intercourse, and SA P answered, "[l]ike I had stated earlier, sir, I'm trained on picking up nonverbal cues during interviews . . . and the accused was giving off several nonverbal cues which made us believe that we needed to dig a little deeper." *Id.* On re-direct examination, SA P testified about "large red sun blotches" appearing on Knapp's face when he spoke about the "actual incident." *Id.*

---

[5] The government does not argue that appellant affirmatively waived this claim, and we are not convinced that he intentionally relinquished or abandoned any claim regarding human lie detector testimony, which is the traditional standard for waiver. *See Olano*, 507 U.S. at 733 ("[W]aiver is the 'intentional relinquishment or abandonment of a known right.'" (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

Our superior court determined that SA P acted as a human lie detector. *Id*. at 36-37.

> [I]t would have been permissible for SA [P] to describe Appellant's physical reaction to the interrogation questions . . . . It also would have been permissible for SA [P] to explain that this reaction caused him to continue questioning Appellant. But SA [P] went too far by declaring that he had been trained to divine a suspect's credibility from his physical reactions to the questioning. This testimony, suggesting that SA [P]'s evaluation of Appellant's denial of wrongdoing was based on his expertise in determining credibility, impermissibly "'usurp[ed] the [members'] exclusive function to weigh evidence and determine credibility.'" *Kasper*, 58 M.J. at 315 (quoting *United States v. Birdsall*, 47 M.J. 404, 410 (C.A.A.F. 1998)).

*Id.* (citation omitted). The court held SA P's testimony to be plain and obvious error. *Id.* at 37.

Here, in some ways, SA K-O's testimony is worse than SA P's testimony in *Knapp*. Special Agent K-O went into significantly more detail about her training and ability to spot verbal and nonverbal signs of deception than SA P apparently did. The testimony presented SA K-O as taking master's level courses with CIA agents at the National Center for Credibility Assessment. She testified about her ability to discern verbal and nonverbal signs of deception. Special Agent K-O told the panel that she would move from interview to interrogation mode when she saw sufficient signs of deception. And, when questioning appellant, she did just that after appellant did not answer well in response to shock-absorbing questions. Special Agent K-O testified she told appellant she thought he was lying when he denied the allegations. While describing appellant's eventual confession, SA K-O stated, "he got this really like faraway look in his eyes like he was reliving it." Finally, SA K-O told the panel that she cuts off denials when a suspect exhibits behavior leading her to believe otherwise.

Cumulatively, this testimony constituted human lie detector testimony. Put another way, the human lie detector testimony in this case is not just SA K-O's single line "he got this really like faraway look in his eyes like he was reliving it." *See id.* at 38 (Baker, C.J., with whom Ryan, J., joins, dissenting) ("Moreover, SA [P]'s statement that he could discern deception by observing a person's physiological and behavioral reaction to questions is the very essence of what it would mean to serve as a human polygraph."). Following SA K-O's testimony about her ability to spot deception through demeanor, she then testified directly about

appellant's demeanor. In ordinary circumstances, evidence about one's demeanor is often admissible. *See id.* at 36-37; *see also United States v. Clark*, 69 M.J. 438, 444-46 (C.A.A.F. 2011) (explaining the difference between testimonial and nontestimonial demeanor evidence). However, SA K-O presented demeanor evidence through the lens of a human lie detector. Like SA P in *Knapp*, SA K-O went too far in her testimony. *See id.* at 37 ("But SA [P] went too far by declaring that he had been trained to divine a suspect's credibility from his physical reactions to the questioning.")

The error in this case is plain and obvious. "'[A]n error is 'plain' if it is 'so egregious and obvious' that a trial judge and prosecutor would be 'derelict' in permitting it in a trial held today.'" *United States v. Fisher*, 67 M.J. 617, 620 (Army Ct. Crim. App. 2009), *rev. denied*, 68 M.J. 184 (C.A.A.F. 2009) (quoting *United States v. Thomas*, 274 F.3d 655, 667 (2d Cir. 2001) (other citation omitted)). The legal prohibition on human lie detector testimony was plain and obvious at trial and on appeal. *See Knapp*, 73 M.J. at 37 ("Our condemnation of human lie detector testimony easily predates Appellant's trial.") (citing *United States v. Petersen*, 24 M.J. 283, 284-85 (C.M.A. 1987)). Special Agent K-O repeatedly testified about her ability to spot deception, told the panel she told appellant she did not believe his denials, and bolstered appellant's confession by stating that he appeared to be "reliving" his crimes while confessing.

We next determine whether this error materially prejudiced appellant's substantial rights. UCMJ art. 59(a). "An obvious error materially prejudices the substantial rights of the accused when it has an unfair prejudicial impact on the [court members'] deliberations." *Knapp*, 73 M.J. at 37 (citing *United States v. Powell*, 49 M.J. 460, 463 (C.A.A.F. 1998) (additional citations and quotation marks omitted)). After careful consideration, we are convinced that the error was prejudicial.

First, the military judge did not issue a cautionary instruction regarding SA K-O's testimony. *See id.* at 36 (citing *Kasper*, 58 M.J. at 315). A prompt, cautionary instruction can help negate any prejudice flowing from improper human lie detector testimony. *See United States v. Mullins*, 69 M.J. 113, 117 (C.A.A.F. 2010). As a matter of logic, the lack of a cautionary instruction may permit the human lie detector evidence to have an "undue influence on a [panel's] role in determining the ultimate facts in the case." *United States v. Birdsall*, 47 M.J. 404, 411 (C.A.A.F. 1998); *see also Kasper*, 58 M.J. at 319 ("Regardless of whether there was a defense objection during the prosecution's direct examination of SA [L], the military judge was responsible for making sure such testimony was not admitted, and that the members were provided with appropriate cautionary instructions." (citing *United States v. Whitney*, 55 M.J. 413, 415-16 (C.A.A.F. 2001))).

The military judge did sustain appellant's later objection based on speculation. We are not convinced this sustained objection eliminates prejudice in this case. There was no follow-on prompt cautionary instruction about human lie detector testimony, as required by *Knapp* and *Kasper*.[6] Further, the scope of SA K-O's human lie detector testimony pervaded her entire testimony, so much so that even otherwise permissible testimony about appellant's demeanor is now tainted because it was presented by someone purporting to be a human lie detector. Furthermore, to the extent that the military judge gave a limiting instruction regarding a separate witness's testimony about believing HJ, that instruction does not address SA K-O and was not given close enough in time to SA K-O's testimony to be effective.

Second, trial counsel's opening statement previewed SA K-O's human lie detector testimony, when the trial counsel told the panel that appellant's demeanor changed during his confession and that "it was almost as if he was reliving it." Special Agent K-O's testimony was a vital part of the government's case.

Third, the human lie detector testimony went not to a peripheral matter or "as a building block of circumstantial evidence," but to a central – if not the central – issue of the case: whether appellant's confession to touching his stepdaughter was truthful. *Kasper*, 58 M.J. at 319. One of the crimes appellant confessed to was a touching that HJ could not even remember, and he was convicted largely on the basis of that confession.

Fourth, the government's case was not so overwhelming as to negate prejudice. Although HJ provided convincing reasons why she recanted prior to trial, the panel was still faced with a victim who had repeatedly recanted. However forceful appellant's confession may be, the panel still viewed it through the lens of the human lie detector who presented it to them. *See id.* ("[T]he error in permitting such evidence to be introduced was clear and it materially prejudiced the substantial right of appellant to have the members decide the ultimate issue without the members viewing Appellant's credibility through the filter of human lie detector testimony."). Furthermore, appellant was found guilty in one instance of touching HJ where HJ could not even remember the touching. In that instance, appellant's confession clearly was the most important evidence supporting that conviction, and that confession was presented through a CID agent who acted as a human lie

---

[6] The Military Judges' Benchbook only has an instruction for human lie detector testimony from expert witnesses. *See* Dep't of Army, Pam. 27-9, and Legal Services: Military Judges' Benchbook [hereinafter Benchbook], para. 7-9-1 (10 Sep. 2014). We recommend the Benchbook be amended to include instructions for instances involving human lie detector testimony from both lay and expert witnesses.

detector.[7] As noted above, the human lie detector testimony was also a central part of the government's case against appellant for abusive sexual contact with the child HJ on the couch.

In finding material prejudice to appellant's substantial rights, we are mindful not to conflate the error and the prejudice. *See Puckett v. United States*, 556 U.S. 129, 142 (2009) (rejecting an attempt to recast the error as the effect on substantial rights). "Any trial error can be said to impair substantial rights if the harm is defined as 'being convicted at a trial tainted with [fill-in-the-blank] error.'" *Id*. However, given the evidentiary posture of the case, "[a]ny impermissible evidence reflecting that [appellant] was truthful [or dishonest] may have had particular impact upon the pivotal credibility issue and ultimately the question of guilt." *Brooks*, 64 M.J. at 330.

This prejudicial error affects appellant's two convictions under Article 120, UCMJ, as his confessions were vital parts of the government's case. We are not convinced this error was prejudicial for appellant's convictions of conspiracy and willful disobedience of a superior officer. The evidence was overwhelming for those offenses. Additionally, appellant's confession and the testimony of SA K-O were not relevant to those convictions. We affirm those convictions in our decretal paragraph.

Appellant's convictions for abusive sexual contact with a child clearly constitute the gravamen of the government's case against him. We are not convinced that we can reassess the sentence. *See United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013) (establishing a framework to determine whether Courts of Criminal Appeals can reassess sentences).

---

[7] We also look to *Knapp*, where our superior court found prejudice, when measuring prejudice in this case. In *Knapp*, the government appeared to present a strong case, including but not limited to, appellant's oral and written confessions; A1C ES's testimony that she was too inebriated to remember the night or to have consented to sexual contact; testimony of another witness who stated A1C ES was "pretty drunk," "really drunk," and even "could [not] walk on her own;" a nurse who testified that appellant denied having sexual intercourse with A1C ES; appellant's own testimony, where he admitted to removing the condom from the garbage can in A1C ES's room; and physical evidence in the form of appellant's DNA confirming that sexual intercourse occurred between Knapp and AIC ES. *See Knapp*, 73 M.J. at 38 (Baker, C.J., with whom Ryan, J., joins, dissenting) (noting the strength of the government's case). Further, the panel in *Knapp* was able to view SA P's interrogation of Knapp. *Id*. Here, the only evidence of appellant's oral confession was presented through SA K-O. Given the strength of the government's case in *Knapp*, we cannot conclude that the strength of the government's case here negates prejudice.

While every interrogation and confession is unique, there was nothing special or unusual regarding appellant's confession. As SA K-O noted, criminal accused often deny, then slowly make admissions, and eventually confess. The government can easily admit such confessions without superfluous testimony from CID agents acting as human lie detectors. The government is not permitted to present human lie detector testimony in rebutting defense attempts to show such confessions are involuntary, coerced, or false.

### b. Dilatory Post-trial Processing

Appellant also requests relief for dilatory post-trial processing, where the convening authority took action 739 days after the court-martial concluded. Of that period, only 20 days are attributable to defense delay. Appellant requests relief pursuant to this court's statutory authority. *See* UCMJ art. 66(c); *United States v. Collazo*, 53 M.J. 721 (Army Ct. Crim. App. 2000) (recognizing the statutory authority of Courts of Criminal Appeals to grant relief for dilatory post-trial processing).

However, given appellant's meritorious issue regarding human lie detector testimony, we must determine if the post-trial delay violated appellant's due process rights to timely post-trial processing. *See Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004) ("An appeal that needlessly takes ten years to adjudicate is undoubtedly of little use to a defendant who has been wrongly incarcerated on a ten-year sentence.") (quoting *United States v. Smith*, 94 F.3d 204, 207 (6th Cir. 1996)). Appellant does not ground his post-trial processing claim as a due process violation. However, we are compelled to determine whether appellant has suffered a due process violation for several reasons.

First, in the landmark case of *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006), our superior court established a "presumption of unreasonable delay that will serve to trigger the full [*Barker v. Wingo*, 407 U.S. 514 (1972),] analysis where the action of the convening authority is not taken within 120 days of the completion of trial." Second, our superior court in *Moreno* further urged this court to exercise "institutional vigilance" in this area of law. 63 M.J. at 143. Lastly, our statutory authority under Article 66(c) requires us to review the "entire record." *See United States v. Tardif*, 57 M.J. 219, 223 (C.A.A.F. 2002) ("Our Court has consistently recognized the broad power of the Courts of Criminal Appeals to protect an accused.") (citation omitted). These reasons sufficiently establish our authority to review whether appellant suffered a due process violation in the post-trial processing of his case, even though he did not raise this issue before this court. We do so while acknowledging that the record may be less developed given the lack of litigation on this issue.

12

As noted above, in determining whether post-trial delay results in a due process violation, we apply the four-factor test announced in *Barker*. 407 U.S. at 530; *see also Moreno*, 63 M.J. at 135. These factors include (1) length of the delay, (2) reasons for the delay, (3) assertion of the right to a timely review and appeal, and (4) prejudice. *Id.* "Once this due process analysis is triggered by a facially unreasonable delay, the four factors are balanced, with no single factor being required to find that post-trial delay constitutes a due process violation." *Moreno*, 63 M.J. at 136. These factors ultimately weigh in favor of appellant.

First, the length of the delay – 739 days – is facially unreasonable under any standard. *See id.* at 142 (establishing a presumption of unreasonable delay when the convening authority takes action more than 120 days after the trial ends); *Diaz v. Judge Advocate General of the Navy*, 59 M.J. 34, 39 (C.A.A.F. 2003) ("The nature of this [court's] review calls for, if anything, even greater diligence and timeliness than is found in the civilian system."). This 1129-page record, while lengthy, was not particularly complex or unusual. This factor weighs in favor of appellant.

Second, the government's explanations for the delay involve court reporter shortages and high number of cases tried. Our superior court has held "that personnel and administrative issues . . . are not legitimate reasons justifying otherwise unreasonable post-trial delay." *United States v. Arriaga*, 70 M.J. 51, 57 (C.A.A.F. 2011) ("To allow caseloads to become a factor in determining whether appellate delay is excessive would allow administrative factors to trump the Article 66 and due process rights of appellants.") (citing *Moreno*, 63 M.J. at 137) (additional citations and quotations omitted). The reasons for delay weigh in favor of appellant.

Third, appellant asserted his right to speedy post-trial processing nine times before transcription was complete and the military judge authenticated the record of trial, not including an instance where appellant's mother personally wrote the convening authority asking for, among other matters, a copy of the record. This factor weighs in favor of appellant. *See Barker*, 407 U.S. at 531 ("The more serious the deprivation, the more likely a defendant is to complain.").

Fourth, we apply three factors when analyzing prejudice in the context of a due process violation for post-trial delay:

> (1) prevention of oppressive incarceration pending appeal;
>
> (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and

(3) limitation of the possibility that a convicted person's
grounds for appeal, and his or her defenses in case of
reversal and retrial, might be impaired.

*Moreno*, 63 M.J. 138 (citing *Rheuark v. Shaw*, 629 F.2d 297, 303 n.8 (5th Cir.
1980)) (additional citations omitted).

The first sub-factor is "directly related to the success or failure" of
appellant's substantive appeal. *Id.* at 139. "If the substantive grounds for the appeal
are not meritorious, an appellant is in no worse position due to the delay, even
though it may have been excessive." *Id.* (citing *Cody v. Henderson*, 936 F.2d 715,
720 (2d Cir. 1991)). Appellant's remedy for the human lie detector issue is for this
court to set aside appellant's sexual assault convictions and the sentence. Put
another way, appellant served confinement as part of a sentence we cannot affirm.
"[I]f an appeal is not frivolous, a person convicted of a crime may be receiving
punishment the effects of which can never be completely reversed or living under
the opprobrium of guilt when he or she has not been properly proven guilty and may
indeed be innocent under the law." *Id.* (quoting *Rheuark*, 628 F.2d at 304). This
sub-factor weighs in favor of appellant.

The second sub-factor requires "an appellant to show particularized anxiety or
concern that is distinguishable from the normal anxiety experience by prisoners
awaiting an appellate decision." *Id.* at 140. Our superior court in *Moreno* concluded
sex-offender registration following release from confinement sufficiently established
this sub-factor, where appellant's ultimately-successful appeal was still pending at
the time of registration. Appellant has not established a factual predicate that he has
been released yet from confinement and been placed on a sex-offender registry. *Cf.*
*United States v. Bush*, 68 M.J. 96, 100 (C.A.A.F. 2009) (requiring an appellant to
produce corroborating evidence of employment prejudice). At the same time, we are
cognizant sex-offender registration is an "automatic result" after some sex crime
convictions. *United States v. Riley*, 72 M.J. 115, 121 (C.A.A.F. 2013) (citations
omitted); *see also* Dep't of Def. Instr. 1325.07, Administration of Military
Correctional Facilities and Clemency and Parole Authority, app'x. 4 to enclosure 2
(March 11, 2013) (establishing offenses requiring sex offender registration within
three days of release from confinement, including abusive sexual contact with a
child). Because appellant has not established whether he has registered as a sex
offender yet, this factor weighs slightly in favor of the government.

The third sub-factor is relevant when a rehearing is authorized, as is the case
here. *Moreno*, 63 M.J. at 140. "In order to prevail on this factor an appellant must
be able to specifically identify how he would be prejudiced at rehearing due to
delay. Mere speculation is not enough." *Id.* (citation omitted). Because appellant
did not raise a due process claim, his brief does not address this issue. However, we
also acknowledge the difficulty on appeal "in identifying problems that would hinder

an appellant's ability to present a defense at a rehearing."  *Id.* at 141 n.19.  This factor also weighs slightly in favor of the government.

In balancing the *Barker* factors, we have an appellant who, for nearly two years to no avail, continually invoked his right to speedy post-trial processing.  At the same time, appellant had a meritorious appeal warranting a rehearing.  As a result of the post-trial delay, appellant served oppressive incarceration.  The government's reasons for this delay are unavailing given the constitutional rights at issue.  These factors outweigh appellant's failure to establish particularized anxiety and or articulate any prejudice he would suffer at a rehearing.  For the same reasons, we cannot conclude that the post-trial delay was harmless beyond a reasonable doubt.  *See United States v. Allison*, 63 M.J. 365, 370 (C.A.A.F. 2006) ("If we conclude that an appellant has been denied the due process right to speedy post-trial review and appeal, 'we grant relief unless this court is convinced beyond a reasonable doubt that the constitutional error is harmless.") (quoting *Toohey*, 63 M.J. at 363).

Having found a due process violation, we must determine an appropriate remedy.  In *Moreno*, our superior court provided a range of available remedies:

> (a) day-for-day reduction in confinement or confinement credit; (b) reduction of forfeitures; (c) set aside of portions of an approved sentence including punitive discharges; (d) set aside of the entire sentence, leaving a sentence of no punishment; (e) a limitation upon the sentence that may be approved by a convening authority following a rehearing; and (f) dismissal of the charges and specifications with or without prejudice.

*Id.* at 143.  Our range of available remedies is more limited because we are authorizing a rehearing.  Given that appellant has not demonstrated any prejudice he would face at that rehearing, dismissal of the charges and specifications is not appropriate at this stage of the proceedings.  Since we are setting aside the sentence, we cannot as a matter of logic only approve certain portions of the sentence, a common remedy when we grant relief pursuant to Article 66, UCMJ.  In our view, should appellant be convicted at a rehearing, he should be subject to some punishment.  Accordingly, we decline to apply the possible remedy of authorizing no punishment.  At the same time, appellant cannot receive a harsher punishment at a rehearing than approved by the convening authority.  UCMJ art. 63.[8]  Appellant has already served most – if not all – of his confinement.  In our view, the appropriate remedy is to limit the possible punishment at a rehearing to a punitive discharge,

---

[8] An exception to this rule would be if the government tried appellant for additional offenses not tried at the first court-martial.

two years confinement, forfeiture of all pay and allowances, and reduction to the grade of E-1, unless the exception noted in footnote 8 applies.

## CONCLUSION

The findings of guilty of Charge III and its specifications are set aside. The remaining findings of guilty are affirmed. The sentence is set aside. A rehearing is authorized. All rights, privileges, and property, of which appellant has been deprived by virtue of this decision setting aside the findings and sentence are ordered restored. *See* UCMJ arts. 58a(b), 58b(c), and 75(a).

Judge CAMPANELLA and Judge CELTNIEKS concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court