# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before the Court Sitting *En Banc*[1]

**UNITED STATES, Appellee**

v.

**Sergeant DAYTRON ABDULLAH**
**United States Army, Appellant**

ARMY 20230223

Headquarters, Fort Carson
Jacqueline L. Emanuel, Military Judge
Lieutenant Colonel Kenton E. Spiegler, Acting Staff Judge Advocate (pretrial)
Lieutenant Colonel Abraham L. Young, Acting Staff Judge Advocate (post-trial)

For Appellant: Colonel Philip M. Staten, JA; Major Mitchell D. Herniak, JA; Major Amanda Williams, JA (on brief); Colonel Philip M. Staten, JA; Lieutenant Colonel Autumn R. Porter, JA; Major Mitchell D. Herniak, JA; Major Amanda Williams, JA (on reply brief).

For Appellee: Colonel Christopher B. Burgess, JA; Lieutenant Colonel Jacqueline J. DeGaine, JA; Major Kalin P. Schlueter, JA, (on brief).

5 November 2024

---
OPINION OF THE COURT ON RECONSIDERATION[2]
---

WALKER, Senior Judge:

Appellant asserts he is entitled to relief for 163 days of post-trial delay. Having considered the entire record, we disagree. Even if we were to conclude that 163 days constitutes excessive post-trial delay in this case, we find: (1) it was not "so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system" *United States v. Anderson*, 82

---

[1] Chief Judge SMAWLEY took final action on this case prior to his departure from the court. Judge POND took final action on this case prior to her designation as Chief Judge. Senior Judge WALKER took final action in this case prior to her retirement. Judge ARGUELLES decided this case while on active duty.

[2] On 30 May 2024, appellee filed a Suggestion for Reconsideration En Banc. The court adopted appellee's Suggestion for Reconsideration En Banc on 14 June 2024.

M.J. 82, 87 (C.A.A.F. 2022) (citation omitted); and (2) setting aside appellant's bad conduct discharge is not *appropriate relief* under Article 66(d).

## BACKGROUND

Appellant's course of misconduct involved multiple incidents in which he demonstrated a disregard for military authority, military regulations, and lawful military orders.

On 21 October 2022, during a unit Halloween event for children, appellant was apprehended for driving under the influence (DUI) of alcohol on Fort Carson. A breathalyzer test established that appellant's breath alcohol concentration was 0.133. Appellant received a General Officer Memorandum of Reprimand for this incident.

Less than a month later, on 15 November 2022, after providing a urine sample and knowing that it would test positive, appellant left his unit without proper authority and texted his supervisor that "[a]fter yesterday I will no longer be coming in formation none of that. I'm done [ ] Do what y'all gotta do, I'm done." Appellant remained absent from his unit until he voluntarily returned on 5 January 2023.

The day after appellant returned to his unit, his troop commander ordered him not to leave the limits of Fort Carson, not to consume alcohol, and to comply with additional restrictions. Additionally, the Fort Carson garrison commander had prohibited appellant from driving on the Fort Carson installation because of his prior DUI. A mere two weeks later, on 19 January 2023, military police detained appellant as he attempted to enter Fort Carson because he was driving an unregistered vehicle with expired license plates, was not in possession of a valid driver's license, could not provide proof of insurance, and was in possession of alcohol.

On 2 February 2023, when appellant failed to report for duty at his unit, his First Sergeant went to appellant's barracks room to check on him. Upon approaching appellant's barracks room, the First Sergeant detected the odor of marijuana coming from appellant's room. After obtaining a valid search authorization, law enforcement agents discovered alcohol and a hand-rolled cigarette that tested presumptively positive for marijuana by a Narcotics Identification Kit.

On 22 February 2023, knowing the command would deny his leave request, appellant traveled to Texas for five days without permission or authority to do so. After he returned and marijuana was discovered in his barracks room, appellant unsuccessfully attempted to flee from his escorts by running through his unit's operations facility and scaling a motor vehicle pool fence.

A military judge sitting as a special court-martial convicted appellant, pursuant to his pleas, of one specification of desertion for his absence from November 2022 until January 2023, one specification of absence without leave for his five day absence in February 2023, one specification of disobeying a superior commissioned officer for his failure to comply with his commander's order not to leave the limits of the Fort Carson installation, and one specification of wrongful use of marijuana in violation of Articles 85, 86, 90, and 112a, Uniform Code of Military Justice, 10 U.S.C. §§ 885, 886, 890, and 912a [UCMJ].

At sentencing, the government offered into evidence appellant's Enlisted Record Brief, his Soldier Talent Profile, and a General Officer Memorandum of Reprimand for the driving under the influence offense in October of 2022. Appellant's defense counsel provided evidence in mitigation and extenuation through witness testimony. An investigator with the Fort Carson Criminal Investigation Division testified about appellant's voluntary cooperation in another drug investigation without any promised benefit in return. Notwithstanding, on cross-examination, the investigator noted that appellant could only provide the name of one military individual. Appellant's former team leader described appellant by saying "[t]o this day, I have not had a soldier that I would say has been better performing th[a]n [appellant] was." This same witness also testified as to his knowledge of the importance of appellant's wife and daughter in appellant's life when the two of them were stationed together in Hawaii. Although appellant's wife claimed she would support appellant's Army career and follow him to his next duty station, when the transfer orders to Fort Carson arrived, she instead remained in Hawaii and initiated divorce and child custody proceedings. Finally, appellant called his former boxing coach and appellant's brother who testified as to appellant's childhood, good character, and "great" rehabilitative potential. Appellant also gave an unsworn statement in which he took full responsibility for his actions and offered a heartfelt apology. Appellant explained how he attained the rank of Sergeant in three years at his first duty station in Hawaii and how after he got to Fort Carson with his family issues, "things started to fall apart in [his] career."

Pursuant to the terms and conditions of the Plea Agreement, the military judge sentenced appellant to a bad-conduct discharge, confinement for 90 days, and reduction to the grade of E-1.[3]

---

[3] Although the military judge discussed awarding appellant 51 days of pretrial confinement credit during the plea colloquy, when she announced her sentence on the record, she neglected to say anything about the pretrial confinement credit. The Statement of Trial Results, however, does correctly reflect an award of 51 days of pretrial credit. Appellant is not asserting that he did not receive this credit, but to

(continued. . .)

This one-day trial took place on 20 April 2023. Appellant submitted matters under Rule for Courts-Martial [R.C.M.] 1106 on 5 May 2023. On 8 June 2023, the court reporter forwarded the record of trial (ROT), a mere 100 pages, to the trial counsel for his review, which he completed the same day. On 13 July 2023, over two months after appellant submitted post-trial matters, the convening authority took no action on the findings or the sentence. Another 58 days passed before the military judge completed the Entry of Judgment [EOJ] on 8 September 2023. The military judge received the record for her certification on 11 September 2023, 96 days after the trial counsel completed his review. The military judge completed her review and certification 11 days later, on 22 September 2023. This court received the ROT on 30 September 2023, 163 days after the announcement of sentence but only 22 days after Entry of Judgment.

The Office of the Staff Judge Advocate (OSJA) included a Post-Trial Processing Timeline memorandum ("memo") in the record of trial, dated 27 September 2023, signed by the Post-Trial Non-Commissioned Officer in Charge (NCOIC), which in total stated:

a. <u>Personnel Changeover and Experience</u>. The Post-Trial section received a new Staff Sergeant in April 2023. Between the months of April and August 2023, the civilian post-trial paralegal was tasked to train the new NCO within post-trial matters. Both Post-Trial team members are dually slotted in Magistrate Court and General Crime sections within the OSJA. All the above *may* have hindered the processing time for US v. Abdullah while balancing daily tasks within the other sections.

(emphasis added).

b. <u>Operational Tempo</u>. There was an increase in court-martials between the months of May through August. The post-trial team worked diligently to meet all post-trial requirements for pending Courts-Martials as well as those that were back logged.

## LAW AND DISCUSSION

We review this case under Article 66, UCMJ, upon the government's request for reconsideration. We granted the government's request for reconsideration, en

---

(. . .continued)
the extent there is any confusion, we confirm that appellant's sentence should properly reflect the award of 51 days of pretrial confinement credit. *See United States v. McDonald,* ARMY 9900233, 2000 CCA LEXIS 330 (Army Ct. Crim. App. 13 Jul. 2000) (mem. op.).

banc, to address appellant's sole assignment of error asserting unreasonable post-trial delay.

We acknowledge that a decision by a panel of this court was vacated upon the court granting the government's request to reconsider that panel's decision en banc. As such, this court has not yet completed its Article 66, UCMJ, review of appellant's case. During this court's consideration of appellant's case en banc, members of the dissent proposed specifying whether appellant set up matters inconsistent with his guilty plea based upon his statements that he left his unit due to a "hostile work environment" and "was in a terrible mental space. . .and was considering suicide at the time" and if so, whether the military judge abused his discretion in accepting appellant's plea. Appellant did not raise this issue in his pleadings.[4] Even though not raised by appellant, we acknowledge this court has a responsibility to only affirm those findings that are correct in law and fact pursuant to Article 66(d)(1), UCMJ. Satisfied that the military judge did not abuse her discretion in accepting appellant's guilty plea, a majority of the court declined to reconsider the providence of appellant's plea and elected to only address the sole issue of post-trial delay in its reconsideration en banc.

We review allegations of unreasonable post-trial delay de novo. *Anderson*, 82 M.J. at 85 (citing *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)).

The Court of Appeals for the Armed Forces (CAAF) has recognized that service level courts of appeal have two separate and independent avenues to provide relief for dilatory post-trial processing: (1) the Due Process Clause of the Fifth Amendment; and (2) the statutory basis under Article 66 when there is no showing of "actual prejudice." *Anderson*, 82 M.J. at 85 (quoting *Toohey v. United States*, 60 M.J. 100, 101-02 (C.A.A.F. 2004) (holding the right to timely appellate review has both statutory roots under Article 66 and constitutional roots under the Due Process Clause)).[5]

---

[4] There are many reasons why appellants may not seek to challenge the providence of their guilty pleas upon appellate review. Based on his pleas alone, appellant could have been sentenced to a total confinement of ten and a half years and a dishonorable discharge, a potential sentence much harsher than that imposed by his plea. After reviewing the record in its entirety, we are satisfied that the military judge did not abuse her discretion in accepting appellant's plea.

[5] Prior to the implementation of the Military Justice Act of 2016 (MJA 2016) in January 2019, Article 66(d)(1), UCMJ, granted this court the statutory authority to "affirm . . . only the sentence or such part or amount of the sentence, as the Court finds correct in law and fact and determines, on the basis of the entire record, should be approved." The MJA 2016 amended Article 66 to add a new section (d)(2), which

(continued. . .)

Our superior court adopted the four factors from *Barker v. Wingo*, 407 U.S. 514 (1972), a Sixth Amendment speedy trial case, in order to provide a framework for analyzing post-trial delay and due process: (1) length of delay; (2) reasons for the delay; (3) appellant's assertion of the right to timely review and appeal; and, (4) prejudice. *Moreno*, 63 M.J. at 135. In *United States v. Toohey*, our superior court further held: "[N]o single factor [is] required to find that post-trial delay constitutes a due process violation." 63 M.J. 353, 361 (*Toohey II*) (C.A.A.F. 2006) (quoting *Moreno*, 63 M.J. at 136) (citing *Barker*, 407 U.S. at 533). Our superior court recently affirmed the application of these factors in analyzing post-trial delay and due process in *Anderson*. 82 M.J. at 85.

With respect to the length of the delay, in *Moreno*, our superior court established a presumption of reasonableness for post-trial processing where the convening authority took initial post-trial action within 120 days of trial and the case was docketed with this court 30 days later. 63 M.J. at 142. In light of the changes implemented by MJA 2016, we modified the *Moreno* timeline in *United States v. Brown* by holding that "this court will presume unreasonable delay in cases where more than 150 days elapse between final adjournment and docketing with this court." 81 M.J. at 510. In *Brown,* we also reiterated that "just as it was under the old procedures, staff judge advocates are advised to explain post-trial processing delays . . . ." *Id.* at 511.

In *United States v. Winfield*, issued one week after this case adjourned, we abandoned *Brown*'s 150-day time limit, finding instead that some cases might justifiably take longer than 150 days to process for review and that others should take significantly less time. 83 M.J. 662, 665 (Army Ct. Crim. App. 2023). Instead of imposing a bright-line time limit, we reaffirmed the requirement for an explanation as set forth in *Brown* and held that in determining the reasonableness of the delay, "we will scrutinize even more closely the unit-level explanations for post-trial processing delays." *Id.* As we further explained in *Winfield*, "we are

---

(. . .continued)
provides in pertinent part that this court "may provide appropriate relief if the accused demonstrates error or excessive delay in the processing of the court-martial after the judgment was entered into the record . . ." There is nothing, however, in the plain language of Article 66(d)(2) indicating or in any way suggesting that Congress sought to: (1) overrule *Toohey* or otherwise alter the use of the *Barker* test to analyze a Due Process claim as set forth below; or, (2) overrule CAAF precedent recognizing our discretion to afford relief under Article 66(d)(1). *See United States v. Brown*, 81 M.J. 507, 511 n.2 (Army Ct. Crim. App. 2021) ("We reject any argument that Article 66(d)(2), UCMJ, somehow cabins our broad and well-established sentence appropriateness authority under Article 66(d)(1), UCMJ, to provide relief for dilatory post-trial processing occurring at other phases of a court-martial.").

consistently interested to know about a case's transcript length, competing requirements (e.g., *actual* operational exigencies, in-court coverage), military judge availability, court reporter availability and utilization for transcription, and resource shortfalls (e.g., insufficient throughput capacity despite court reporter regionalization)." *Id.* at 666 (emphasis in original). When considering whether a delay is excessive, this court broadly focuses "on the totality of the circumstances surrounding the post-trial processing timeline for each case, balancing the interplay between factors such as chronology, complexity, and unavailability, as well as the unit's memorialized justifications for any delay." *Id.* However, when considering memorialized justifications for delay, the Court of Appeals for the Armed Forces has held that "personnel and administrative issues . . . are not legitimate reasons justifying otherwise unreasonable post-trial delay." *United States v. Arriaga*, 70 M.J. 51, 57 (C.A.A.F. 2011).

We not only re-emphasize our interest in the Staff Judge Advocate (SJA) providing an explanation for periods of unexplainable post-trial delay, but we also take this opportunity to re-emphasize the importance of providing a detailed explanation and something more than a mere recitation of the timeline of post-trial events. A memorandum with nothing more than a mere timeline and scant information explaining periods of significant delay is unhelpful to this court and will not weigh in favor of the government in our analysis of post-trial delay. Further, the government should never presume on its own what constitutes excessive post-trial delay and fail to provide a post-trial processing memorandum. If there are periods of time in which it may appear there is a lack of reasonable diligence in the post-trial processing of a case, the government would be well-served to provide a memorandum explaining those periods. For example, in this case, it took the convening authority 69 days after the submission of appellant's post-trial matters to act on appellant's sentence and another 21 days to complete the ministerial task of transmitting a draft Entry of Judgment (EOJ) to a military judge after the convening authority's action. The post-trial processing memo provides no explanation for these periods of time. The SJA, responsible for advising the convening authority on referral of charges and post-trial action on the sentence, is ultimately responsible for ensuring efficient post-trial processing. A responsible party within the OSJA with supervisory oversight of the post-trial process, acting on behalf of the convening authority, should provide a detailed explanation for lengthy lapses of progress in post-trial processing. Without such an explanation, this court lacks potentially favorable information for the government when considering the totality of the circumstances that may justify periods of delay in post-trial processing.

Appellant did not assert a due process violation for unreasonable post-trial delay. However, we will address whether there was a due process violation given that this court agreed to reconsider its original holding that the length of delay in this case amounted to a due process violation. *United States v. Abdullah*, ARMY 20230223, 2024 CCA LEXIS 199, at *11-12 (Army Ct. Crim. App. 30 Apr. 2024)

(mem. op.). We find no prejudice under the fourth *Barker* factor.[6] Nor do we find, "in balancing the other three factors, that the [post-trial] delay was so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." *Anderson*, 82 M.J. at 88. We will address each of the three remaining *Barker* factors, in turn.

While there were discrete periods of time during the post-trial processing of this case that were not the model of efficiency, we do not find that the 163 days of post-trial processing weighs in appellant's favor. We note that there is no explanation of why it took the convening authority 69 days to take no action on appellant's sentence after the submission of post-trial matters. Without any explanation, we find that the government could have moved with greater efficiency in obtaining the convening authority's decision. We also find that it should not take 21 days, without exceptional circumstances, to transmit the convening authority's action to the military judge for purposes of completing the EOJ. We recognize that the transcript was only 100 pages with four government exhibits and four appellate exhibits. However, in considering the 163 days in its entirety, we do not find that this length of delay is so egregious that it weighs in appellant's favor.

With respect to the purported reasons for the delay, we emphasized in *Winfield* the importance that the SJA provide an explanation for any apparent delay. 83 M.J. at 665-66. Specifically, we noted our interest in the length of the transcript, competing requirements (e.g., operational exigencies, in-court coverage), military judge availability, court reporter availability and utilization for transcription, and resource shortfalls. *Id.* at 666. We do not find the post-trial processing memo provided by the OSJA adequately explains the periods of time in which the processing of this case lagged. As previously noted, there is no explanation for the 21 days it took to provide the EOJ to the military judge after the convening authority took no action in the case. The ministerial task of drafting the EOJ and transmitting

---

[6] We note that this court concluded there was no prejudice under the fourth *Barker* factor in our original decision in this case. In assessing the fourth *Barker* factor of prejudice, we consider three sub-factors: "(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired." *Moreno*, 63 M.J. at 138-39 (quoting *Rheuark v. Shaw*, 628 F.2d 297, 303 n.8 (5th Cir. 1980)). The first sub-factor is directly related to the success or failure of appellant's substantive appeal, and the second sub-factor requires appellant to show particularized anxiety that is distinguishable from the normal anxiety of waiting for an appellate decision. *Id.* at 139-40. Applied in this case, because appellant does not raise any substantive issues on appeal other than post-trial delay and has not demonstrated any "particularized" anxiety, the fourth *Barker* factor also weighs in favor of the government.

it to the military judge should not take 21 days. Additionally, there is no explanation for the 96 days it took to provide the transcript to the military judge after trial counsel completed reviewing the transcript. The memo does not even address, much less make any effort to give a specific reason for, the 96-day delay. Instead, in two very short paragraphs, it generally describes personnel training and mission issues occurring during appellant's post-trial processing before stating "all of the above *may* have hindered the processing time" in this case. The memo concludes by asserting that there was an increase in the frequency of courts-martial between the months of May and August. Unfortunately, without receiving specific data, this court cannot meaningfully gauge how many courts-martial were processed at Fort Carson in the summer of 2023. In accounting for delays, we harken to our superior court's jurisprudence on the matter that "personnel and administrative issues, such as those raised by the Government in this case, are not legitimate reasons justifying otherwise unreasonable post-trial delay." *Arriaga*, 70 M.J. at 57. As such, the second *Barker* factor, the reasons for the delay, weighs heavily in favor of appellant. *See also United States v. Canchola*, 64 M.J. 245, 247 (C.A.A.F. 2007) ("However, a general reliance on budgetary and manpower constraints will not constitute reasonable grounds for delay nor cause this factor to weigh in favor of the Government.").

As to the third *Barker* factor, because appellant did not assert his right to a timely review and appeal, this factor weighs in favor of the government.

When there is no finding of prejudice under the fourth *Barker* factor, as is the case here, a due process violation only occurs when "in balancing the three other factors, the delay is so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." *Anderson*, 82 M.J. at 87 (citing *Toohey*, 63 M.J. at 362).

We respectfully disagree with our colleagues in the dissent that unique facts and circumstances exist in this case that would affect the public's perception of fairness and integrity of the military justice system such that a due process violation occurred in this case. First, we do not find that the post-trial delay of 163 days is so extreme that the delay alone would negatively impact the public's perception of our military justice system. There is nothing unique about the length of the post-trial delay in this case. In fact, we find the length of the post-trial delay in this case to be within the range of average post-trial delay. Second, we disagree with the dissent's view that appellant presented a compelling sentencing case. While appellant provided information in mitigation and extenuation through testimony from his brother, his boxing coach, a former team leader, and an investigator as to appellant's assistance in a drug investigation, we do not find that there was anything extraordinary presented that would render appellant's sentencing case unique or compelling. Additionally, we disagree with the dissent's reliance upon there being no identifiable victim in this case as a unique fact upon which to justify the extraordinary relief of disapproving a punitive discharge, particularly one bargained

for by both parties. While we concur that there was no crime victim in this case as defined by R.C.M. 1001(c)(2),[7] we find appellant's misconduct inconsistent with the requirement of good order and discipline and efficiency and effectiveness in the appellant's unit. Our military justice system, based in Article I of the U.S. Constitution, is a disciplinary system the purpose of which is "to promote justice, to assist in maintaining good order and discipline in the armed forces, to promote efficiency and effectiveness in the military establishment, and thereby to strengthen the national security of the United States." *Manual for Courts-Martial, United States* (2019 ed.) [*MCM*], pt. I, ¶3. Appellant's continued disregard for lawful military authority and regulations on multiple occasions, particularly as a noncommissioned officer, was significant and certainly not the behavior expected of a noncommissioned officer. For all these reasons, we find there is nothing unique about this case that would have an adverse impact on the public's perception of the fairness and integrity of the military justice system.

We also disagree with the dissent that the government continues to blatantly violate well-established precedent as set by this court in *Winfield*. In a significant majority of the post-trial delay cases that have come before this court since our decision in *Winfield*, the government included a post-trial processing memorandum in the record of trial.[8] While those may not be the model of perfection in providing detailed explanations for post-trial processing, the mere fact that the government provides such signals that it is attempting to adhere to *Winfield*.

---

[7] A crime victim is defined as "an individual who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense of which the accused was found guilty or the individual's lawful representative or designee appointed by the military judge under these rules." R.C.M. 1001(c)(2).

[8] See *United States v. Hernandez*, ARMY 20210429, 2024 LEXIS 183 (Army Ct. Crim. App. 22 April 2024) (summ. disp.); *United States v. Amador*, ARMY 20220216, 2024 CCA LEXIS 95 (Army Ct. Crim. App. 29 Feb. 2024) (summ. disp.); *United States v. Anthony*, ARMY 20220515, 2024 CCA LEXIS 66 (Army Ct. Crim. App. 7 Feb. 2024) (summ. disp.); *United States v. Cannion*, ARMY 20220366, 2024 CCA LEXIS 26 (Army Ct. Crim. App. 22 Jan. 2024) (summ. disp.); *United States v. Rouson*, ARMY 20220319, 2023 CCA LEXIS 508 (Army Ct. Crim. App. 1 Dec. 2023) (summ. disp.); *United States v. Wilson*, ARMY 20210462, 2023 CCA LEXIS 505 (Army Ct. Crim. App. 29 Nov. 2023) (summ. disp.); *United States v. Sandoval*, ARMY 20220198, 2023 CCA LEXIS 496, (Army Ct. Crim. App. 27 Nov. 2023) (summ. disp.); *United States v. Dunn*, ARMY 20210428, 2023 CCA LEXIS 424 (Army Ct. Crim. App. 3 Oct. 2023); *United States v. Reaper*, ARMY 20210230, 2023 CCA LEXIS 304 (Army Ct. Crim. App. 14 July 2023) (summ disp.); *United States v. Brimmer*, ARMY 20210622, 2023 CCA LEXIS 253 (Army Ct. Crim. App. 9 June 2023) (summ. disp.); *United States v. Sepulveda*, ARMY 20220241, 2023 CCA LEXIS 223 (Army Ct. Crim. App. 5 May 2023) (summ. disp.).

Even were we to hold that the post-trial delay in this case would adversely impact the public's perception of the fairness and integrity of the military justice system, we would not set aside appellant's punitive discharge. While this court possesses broad discretion in fashioning an appropriate remedy for a constitutional violation, we do not possess unfettered discretion. We are mindful of the fact that the appellant and the convening authority entered into a plea agreement pursuant to R.C.M. 705. The result of the plea negotiations was both parties agreeing that the military judge shall adjudge a bad-conduct discharge in exchange for appellant pleading guilty to only some of the charged offenses and for appellant limiting his terms of confinement for each offense to which he pled guilty. To set aside a punitive discharge altogether, under the circumstances of this case, would undermine the process of an accused entering into a plea agreement with a convening authority – an accused should always enter into a plea agreement with the assumption that the terms are binding and enforceable. *See United States v. Smead*, 68 M.J. 44, 59 (C.A.A.F. 2009) ("A pretrial agreement in the military justice system establishes a constitutional contract between the accused and the convening authority."). We note that appellant's requested relief for post-trial delay was a 15-day reduction in his term of confinement, not the setting aside of his punitive discharge. Here, appellant knowingly and voluntarily entered into an agreement for a punitive discharge in exchange for a limitation on his confinement and for the dismissal of several specifications of possession and use of controlled substances. To set aside a punitive discharge under the facts and circumstances of this case would demonstrate a disregard for appellant's agreement with the convening authority and would constitute an abuse of this court's discretion. Even more importantly, we find that setting aside the punitive discharge in this case, given the nature and frequency of appellant's misconduct and his agreement to a punitive discharge, would serve to adversely impact the public's perception of the integrity of the military justice system.

We further note that appellant asserts that this court should grant relief not for a due process violation, but rather because the post-trial delay in this case is excessive under Article 66(d)(2). We disagree with the dissent that setting aside the punitive discharge in this case is appropriate relief whether for a due process violation or an Article 66(d)(2) violation. Article 66(d)(2) dictates that we "may provide *appropriate* relief" upon a demonstration of "error or excessive delay in the processing of the court-martial" after entry of judgment. Article 66(d)(2), UCMJ (emphasis added). Article 66(d)(2) leaves the determination as to whether relief is provided, and what type of relief is appropriate, to this court's discretion. Appellant committed multiple incidents of continued misconduct over the course of five months, which included driving while intoxicated, illegal use of a controlled substance, deserting his unit, disobeying a commissioned officer, driving a vehicle without a valid driver's license, registration, or insurance, and possession of a controlled substance in his barrack's room. Appellant's misconduct only ceased once he was placed in pretrial confinement. A bad-conduct discharge is an

11

appropriate characterization of appellant's service given the severity and breadth of his misconduct, even accounting for the mitigation evidence he presented during the presentencing hearing. Therefore, even if we were to find the delay here excessive, we find there is no relief that is *appropriate* under the circumstances of this case.

For all the aforementioned reasons, there was no unreasonable post-trial delay in this case in violation of appellant's due process rights or in violation of Article 66(d)(2), UCMJ.

## CONCLUSION

The findings of guilty and the sentence are AFFIRMED.

Chief Judge SMAWLEY, Senior Judge FLEMING, Judge POND, and Judge PARKER concur.

MORRIS, Judge, concurring in part.

While I agree with my colleagues in the majority that the post-trial delay in this case did not violate the Due Process Clause of the Fifth Amendment or Article 66(d)(2), I write separately because I would have found the 163-days of post-trial delay excessive and weighed in favor of appellant under prong one of the *Barker* analysis. In *Winfield*, when this court overruled *Brown's* 150-day timeline, we acknowledged that "some cases justifiably take longer than 150 days to process for appellate review. Others should take significantly less time." *Id*. at 665. By deciding that 163 days to process a record with a 100-page transcript that lacked any complex legal issues or errors and, minimal exhibits was not excessive, the majority has rendered this court's opinion that some cases should take significantly less time, meaningless.

ARGUELLES, Judge, dissenting,

I agree with the majority's conclusions that the Staff Judge Advocate (SJA) is ultimately responsible for the explanation for delays in the post-trial process, and that the post-trial processing memorandum in this case is inadequate. I part ways with the majority, however, as to the nature of the relief warranted.

Contrary to what seems to be the focus of the majority opinion, this case has little to do with the actual length of the post-trial delay (163 days), but rather turns on the government's continued and deliberate failure to abide by the venerable precedent of both this court and the United States Court of Appeals for the Armed Forces (CAAF). Unfortunately, the majority's opinion will serve only to reinforce the message that, notwithstanding the long line of opinions issued by both this court and the CAAF, the government can continue to provide wholly deficient

12

explanations for post-trial delays without any meaningful sanction. Put another way, this court's continued "boy who cried wolf" admonition that "SJA's you need to get your act together and we really mean it this time," while at the same time failing to provide any meaningful sanction, is not likely to instill continued public confidence in the integrity of the military justice system, nor is it likely to compel the government to comply with our prior rulings.

## A. Prior Precedent

There is an extensive history of precedent from both this court and the CAAF holding that administrative/manpower constraints are not a justifiable reason for post-trial delay, and that the government is responsible for documenting any delays with thorough, credible, and relevant specificity. For example, in 1990, the CAAF's predecessor Court of Military Appeals held that delays involving clerical tasks were "the least defensible of all" post-trial delays. *United States v. Dunbar*, 31 M.J. 70, 73 (C.M.A. 1990). In its seminal post-trial delay case issued *eighteen* years ago, the CAAF reiterated: (1) post-trial delays "must be justifiable, case-specific delays supported by the circumstances of that case and not delays based on administrative matters, manpower constraints or the press of other cases;" and (2) convening authorities were expected "to document reasons for delay . . . ." *United States v. Moreno*, 63 M.J. 129, 143 (C.A.A.F. 2006). *See also United States v. Dearing*, 63 M.J. 478, 486 (C.A.A.F. 2006). Citing *Moreno*, the CAAF in *United States v. Canchola* held:

> Where operational requirements affect post-trial processing delays, staff judge advocates and convening authorities should ensure that those reasons are documented in the record of trial. *Moreno*, 63 M.J. at 143. Reviewing courts can then weigh and balance those reasons in determining whether they provide adequate explanation for any apparent post-trial delays. However, a general reliance on budgetary and manpower constraints will not constitute reasonable grounds for delay nor cause this factor to weigh in favor of the Government.
> *See id.* at 137.

64 M.J. 245, 247 (C.A.A.F. 2007).

In *United States v. Arriaga*, the CAAF again held that "personnel and administrative issues, such as those raised by the Government in this case, are not legitimate reasons justifying otherwise unreasonable post-trial delay," and were critical of the fact that the record provided no legitimate reason for the delay. 70 M.J. 51, 57 (C.A.A.F. 2011) (citing *Moreno*, 63 M.J. at 137). *See also United States v. Jackson*, 74 M.J. 710, 719 (Army Ct. Crim. App. 2015) ("[T]he government's explanations for the delay involve court reporter shortages and high number of cases tried. Our superior court has held 'that personnel and administrative issues . . . are

13

not legitimate reasons justifying otherwise unreasonable post-trial delay.'") (citing *Arriaga*, 70 M.J. at 57). More recently, in *United States v. Anderson* the CAAF once again emphasized the government's obligation to provide a "detailed or specific reason for the delay in creating the transcript or authenticating the record of trial." 82 M.J. 82, 86-87 (C.A.A.F. 2022).

Lest there be any doubt about the need for the government to provide detailed explanations for post-trial delay, just last year in *United States v. Winfield*, this court held:

> [W]e will scrutinize even more closely the unit-level explanations for post-trial processing delays between final adjournment and appellate docketing, including those less than 150 days. Staff judge advocates who decline to memorialize delays with *thorough, credible, and relevant specificity do so at the peril of their unit's cases on appeal.*

83 M.J. 662, 665-66 (Army Ct. Crim. App. 2023) (emphasis added). Further highlighting the need for a detailed explanation, we explained in *Winfield* that "we are consistently interested to know about a case's transcript length, competing requirements (e.g., *actual* operational exigencies, in-court coverage), military judge availability, court reporter availability and utilization for transcription, and resource shortfalls (e.g., insufficient throughput capacity despite court reporter regionalization)." *Id.* at 666 (emphasis in original). A concurring opinion reiterated that "the chronology for each case should account for any lengthy processing period with a detailed, original account of all relevant circumstances," and cited *Canchola* for the principle that "staff judge advocates and convening authorities should ensure the reasons for delay *are documented in the record of trial.*" *Id.* at 667-68 (emphasis in original).

Subsequent to the publication of *Winfield* and *prior* to the date of the post-trial memorandum in this case, this court issued no less than four decisions which reiterated the requirement for a detailed post-trial delay explanation. *See, e.g. United States v. Jefferson*, ARMY 20220448, 2023 CCA LEXIS 382, at *4 (Army Ct. Crim. App. 6 Sep. 2023) (summ. disp.); *United States v. Brimmer*, ARMY 20210622, 2023 CCA LEXIS 263, at *5-6 (Army Ct. Crim. App. 9 Jun 2023) (summ. disp.); *United States v. Garrigus,* ARMY 20220259, 2023 CCA LEXIS 335, at *3 (Army Ct. Crim. App. 9 Aug 2023) (summ. disp.) ("Either way one looks at it - whether under *Brown* or *Winfield* - units owe an explanation for such slow post-trial action. When those who administer military justice in the field ignore binding precedent, we should not tolerate the resultant strain upon our system's credibility."); *United States v. Pulley*, ARMY 20220494, 2023 CCA LEXIS 289, at *2 (Army Ct. Crim. App. 6 Jul. 2023) (summ. disp.)

Although it acknowledges *Winfield*, for the most part the majority ignores the long-line of precedent squarely holding that it is the responsibility of the government to provide detailed and specific reasons justifying its post-trial processing delays. With respect to the post-*Winfield* cases cited above, the majority rationalizes that although the memorandums in those cases "may not be the model of perfection," the mere fact that the government provided a memorandum at all at least "signals that it is attempting to adhere to *Winfield*."

Nowhere in *Winfield*, however, did this court say that we would give the government a pass from its obligation to provide a detailed post-delay explanation so long as the SJA "attempted" to follow our directives, or made the minimal effort to provide something in writing no matter how deficient it might be. Moreover, and in any event, *Winfield* was certainly not the first time that both this court and the CAAF have put the government on notice of its obligation to provide detailed and specific explanations for post-trial delays. As such, the time has long since passed where it might be acceptable for this court to excuse the government's failure to comply on the grounds of "at least they are trying." Likewise, any attempt on the part of this court to *sub silentio* take back what we said in *Winfield* must fail in light of CAAF's rulings on the same issue. *See United States v. Tovarchavez*, 78 M.J. 458, 465 (C.A.A.F. 2019) ("[I]t is for this Court, not the ACCA, to overrule our precedent.") (citations omitted).

In sum, notwithstanding the stern language and the "we really mean it this time" tone of the majority opinion, the clear signal this court is once again sending to the field is that, notwithstanding our holdings in *Winfield, Jefferson, Brimmer, Garrigus, et. al.*, and notwithstanding the CAAF's opinions in *Moreno, Canchola, Arriaga, and Anderson*: (1) post-trial delay is simply not a priority for this court; and (2) the government can continue to submit woefully deficient post-trial memos without fear of any significant repercussions.

### B. Binding Nature of Plea Agreement

Shedding crocodile tears, the majority argues that setting aside appellant's punitive discharge in this case "would demonstrate a disregard for appellant's agreement with the convening authority . . . ." Any such attempt to bolster the majority's holding in this case by citing to the "binding" nature of plea agreements, however, rings hollow in light of this court's recent opinion in *United States v. Hunter*, 84 MJ 715 (Army Ct. Crim. App. 2024).

In *Hunter*, the government charged appellant with involuntary manslaughter and negligent homicide after he failed to stop at a stop sign while driving distracted, and then struck and killed an innocent pedestrian in the crosswalk. *Id*. at *2. Seeking to avoid the ten-year maximum penalty exposure for the involuntary manslaughter specification, appellant agreed to plead guilty to negligent homicide

*and* to be discharged from the service with a dishonorable discharge. In exchange, and as part of the written plea agreement, the convening authority agreed to dismiss the involuntary manslaughter specification. *Id.* at *1. There was no dispute that the military judge properly advised appellant as to the impact of a dishonorable discharge, and that the convening authority and the government fulfilled all their obligations under the plea agreement. *Id.* at *3-4. Nevertheless, citing its "carte blanche" ability to do justice and its "unfettered discretion," this court in *Hunter* unilaterally vacated appellant's "binding" promise to accept a dishonorable discharge and instead reduced appellant's separation to a bad conduct discharge, simply because three appellate judges decided that a dishonorable discharge (for conduct involving the death of an innocent civilian) was too harsh of a punishment. *Id.* at *6-7, 10. In so doing, the court in *Hunter*: (1) "demonstrated a [complete] disregard for appellant's agreement with the convening authority;" (2) acted contrary to the majority's holding in this case that "we do not possess unfettered discretion;" and, (3) disregarded the fact that the convening authority almost certainly would not have agreed to dismiss the involuntary manslaughter specification if he or she knew that this court would later set aside the dishonorable discharge.[9]

Along the same lines, in *United States v. Kibler*, 84 M.J. 603, 608-609 (Army Ct. Crim. App. 2024), this Court had no issue with disregarding both the plain language of the plea agreement and Rule for Courts-Martial 705(e)(4)(B) to set aside and dismiss a defective specification without first allowing the convening authority to opportunity to exercise the authority to withdraw from the plea agreement.

In short, this court's seemingly selective invocation of the binding nature of a plea agreement is far more likely to both disincentivize the convening authority's willingness to accept future offers to plead guilty and undermine public confidence in our system of military justice, than will the simple act of enforcing precedent and holding the government accountable when it consistently fails to comply with our prior rulings.

## C. *"Victimless" Crime*

The majority's further attempt to bolster its holding by criticizing the underlying panel's characterization of the nature of the victim in this case also falls flat. The underlying decision did *not* state that this was a "victimless" crime, but rather held only that "the offenses at issue do not have any *identifiable individual* victims." *United States v. Abdullah*, ARMY 20230223, 2024 CCA LEXIS 199 at

---

[9] To be clear, the issue is not that the court in *Hunter* acted outside the bounds of its jurisdiction. Rather as explained in greater detail below, this court's seemingly erratic recognition of the binding nature of plea agreements is far more likely to disincentivize a convening authority from entering into future plea agreements than is the act of enforcing our prior precedent.

*11-12, vacated, (Army Ct. Crim. App. 30 Apr 2024) (mem. op.) (emphasis added).

There is no dispute that the offenses involved in this case did not in fact involve any identifiable individual victims. Moreover, given that this court in *Winfield* cited to appellant's physical assault of two other soldiers as a basis to deny any relief in that case, 83 M.J. at 666, the fact that there are no individual victims in this case is certainly an appropriate factor to consider in determining the scope of relief.

### D. En Banc Review

In pertinent part, United States Army Court of Criminal Appeals Rules of Appellate Procedure Rule 27(a) states that *en banc* consideration is not favored and ordinarily will not be ordered unless necessary to secure or maintain uniformity of the court's decisions or if the proceeding involves a question of "exceptional importance." Neither one of those considerations applies here.

To start with, given that the panel decision below appears to be the *first* case to hold that the government's willful and continued failure to comply with its obligation to provide a detailed explanation for its post-trial delay justifies the remedy of setting aside a discharge, there is simply no conflict between this case and our prior holdings. As such, *en banc* review is not necessary "to secure or maintain uniformity."

Moreover, as eloquently pointed out by Judge Penland in his separate dissenting opinion, *en banc* review is not appropriate because this case does not involve the misapplication of either the law or our prior holdings, but rather involves only the application of binding precedent to a unique set of facts and circumstances. In short, the fact that other judges of this court, after exercising their individual discretion to apply the law to the unique facts and circumstances of this case, might have reached a different result than that of the original panel is not an appropriate basis for *en banc* review.

### E. Conclusion

Upon consideration of the entire record, I respectfully submit that only so much of the sentence extending to confinement for ninety days should be affirmed.

PENLAND, Judge, with whom Judge ARGUELLES joins dissenting,

I rarely vote against en banc review, but I did so here because I believe those who sought it and those who voted to grant it did so in pursuit of uniform results, rather than a uniform application of relevant law to relevant and unique facts. These are different things. The former is virtually impossible under our statutory

17

framework and jurisprudence, and it works against judicial independence. The latter reinforces common legal standards to make case-specific decisions. I recognize my colleagues' different perspectives and interpretations of these and other matters in this case, but that is where I stand.

Now, the suggestion for en banc reconsideration having been adopted, I have carefully considered the views of my colleagues and the parties. It has gone without saying in previous decisions, but I think it is important under the circumstances to explicitly say now: I value my colleagues' judgment and the parties' input. I respectfully dissent.

## A. Post-trial Delay

For brevity's sake and because it is no longer operative, I am reluctant to restate the previous panel's majority decision. However, by granting en banc reconsideration, this court vacated it, and one who wants to know what it said might have trouble finding it. I recognize it is uncommon to essentially restate a no-longer-operative decision. However, for transparency's sake and considering the majority's brief reference to that which it now deems an abuse of discretion, I append it below and stand by it in dissent[10].

I do not disagree with the majority's emphasis that plea agreements are contractual in nature, but there are (at least) two other considerations bearing on this part of the problem. First, we often see cases where an accused voluntarily waives certain alleged errors or agrees to certain punishment through a contract with the convening authority. But, that is a significantly different framework, where the parties are dealing with known information. Here, as far as we can tell appellant had no reason to foresee the post-trial processing problems; if they had such forewarning, appellant and the convening authority would have then had the opportunity to negotiate about them before trial. Second, as appropriate as it is to rely on common law contract principles, it is just as important to understand who the parties are. Article 53a(e) excludes this court from the list of those bound by a plea agreement. In my view this is deliberate and consistent with Article 66's mandate,[11] which I will address in Part C.

The majority and government appellate counsel take exception to dicta from the now-vacated decision to the effect that the majority therein used that case as an opportunity to voice its frustration with other legal offices' unreasonably slow post-trial processing. That is a fair perception. This court perceives Regiment-level attention and capability available to all legal offices, such that no office in the field

---

[10] *See United States v. Abdullah*, ARMY 20230223, 2024 CCA LEXIS 199*, vacated, (Army Ct. Crim. App. 30 April 2024) (mem. op.).

[11] *See also United States v. Hunter*, 84 M.J. 715 (Army Ct. Crim. App. 2024).

should still seem to misapprehend the importance of post-trial processing. And, we and our superior court have provided ample guidance to the field; I will not restate Judge Arguelles's useful reminder on this point. From that backdrop, there is no question that the additive effect of this problem influenced the panel majority. However, our disapproval was *also* uniquely derived from this one legal office's handling of this one case.

Nothing in these remarks should be interpreted as condoning the misconduct of any Soldier, particularly a noncommissioned officer, or dismissing the importance of pretrial negotiations. Here, though, I assign great weight to the perception that a staff section responsible for actuating constitutional and statutory protections, and unburdened by the operational exigencies of combat or other deployment, moved so slowly (for reasons yet unknown) at multiple, legally consequential intervals to pass actionable information between a commanding general and a military judge.

*B. Specifying Issues*

I, among others on the en banc court, sought additional briefing on multiple issues; the majority opinion adequately summarizes them, and I will address them in Part D. As often, I proposed this course of action for two reasons: to alert the parties to matters they had (potentially) not considered, and to give them a chance to provide their analysis.

The proposal did not obtain a majority vote. Though inclined to do so, for collegiality's sake I did not seek to specify issues acting alone, despite the following from the Joint Rules of Appellate Procedure:

> Notwithstanding Rule 7(b),[12] a judge on the panel or Court considering a matter may, acting alone, issue all necessary orders, to include temporary orders or stays, provided the orders do not finally dispose of a petition, appeal, or case. A Court may delegate to its Clerk of the Court or other designated staff the authority to act on motions regarding procedural matters. Joint Rule of Appellate Procedure 7(d).

This episode has prompted disagreement on this court about whether the rules require a majority to approve specifying issues.[13] I think we would all agree that collegiality should encourage a judge to try to obtain consensus on such a procedural step. However, in my view the rules do not require unanimity or even majority

---

[12] According to Joint Rule 7(a), "[t]he concurrence of a majority of such judges, whether present and voting or voting telephonically or electronically, shall be required for a final resolution of any matter before the panel or Court en banc, subject to subsections (b), (c), and (d)."

[13] I acknowledge that is our customary practice.

agreement; my colleagues in the majority obviously see it differently. In *this* case, the providence issues are not so vexing that it is essential to get the parties' positions. But, I remain concerned for a future case where an individual judge determines additional briefing is essential to their decision, yet they are unable to obtain the parties' advocacy (without causing internecine quarrel). I believe the rules are clear, but the authors should be aware of this material interpretive conflict.

### C. Scope of En Banc Reconsideration

This court's disagreement about specifying issues is part of a larger, fundamental disagreement about the scope of en banc reconsideration. The majority has "elected" not to consider anything other than the post-trial delay dispute:[14]

> Satisfied that the military judge did not abuse his discretion in accepting appellant's guilty plea, a majority of the court declined to reconsider the providence of appellant's plea and elected to only address the sole issue of post-trial delay in its reconsideration, en banc.

There are two fundamental problems with this statement. First, it is internally inconsistent. Lest there be any confusion, certain individual members of the en banc court have reconsidered the providence of appellant's guilty pleas and certain other members have chosen not to do so. Those who "declined" to reconsider the topic never considered it in the first place. In other words, some in the majority are apparently satisfied with something they have not considered at all. This seems impossible.

Second, in my view there is no authority for a member of the en banc court to decline to consider any and all issues that materially affect an appellant's substantial rights. Unlike our superior court, whose jurisdiction has both mandatory and discretionary components, our jurisdiction is entirely mandatory. Article 66 requires us to consider all cases within our jurisdiction, which means we must consider all issues reasonably raised by the record; anything less deprives an appellant of the direct review to which they are entitled.

### D. Providence of Appellant's Guilty Pleas

The majority writes, "we do not find that there was anything extraordinary presented that would render appellant's sentencing case unique or compelling." I disagree. Each case is unique, and each compels the need for reliable judgment. Unique facts in this case cast doubt on its reliability.

---

[14] The majority does correctly state that our Article 66 review is incomplete.

During the providence inquiry for desertion, appellant and the military judge discussed his duty conditions before the appellant absented himself:

MJ: [] Did you somehow think that because you were on rear detachment that you didn't have to show up at work?

A: Your Honor, it was a hostile work environment for me. So I just – I left and didn't want to be there, Your Honor.

. . .

MJ: Okay. So you told me that you were experiencing what you believe to be a hostile work environment at the unit. Did you somehow think that that made it okay for you to stop going to work? I understand that you may have been frustrated, you didn't like what was going on or how you felt you may have been treated, but does that justify or did that, in your mind, justify your leaving?

A: Your Honor, it did not justify my actions. I still had – I did a contract to – for this place. I signed the note. I had a duty. So whether I thought it was right or not, it still wasn't my place to leave. But I did, Your Honor. It's no excuse, Your Honor.[15]

During his unsworn statement on sentencing, appellant said, in pertinent part:

When I got to my second duty station, Fort Carson, things started to fall apart in my career.

I was having conflict with my new unit, the rear-d detachment. I didn't like the fact that I had – they didn't like the fact that I had some issues that I came over here with, which was my household goods not getting here on time; my transportation – the transportation of my car not coming here from Hawaii on time. Plus I had issues with my spouse at the time and we were working on getting a divorce. Once my personal life started falling apart, I didn't handle things the right way and I allowed my career to fall apart too. When I was going through these personal issues, my unit at the time thought I was using my family troubles . . . to try to get out of work.

---

[15] In a paragraph labeled "Disclaimer of Defenses," the parties stipulated: At all times during the events referred to in this stipulation, the Accused was mentally responsible and competent. He was fully capable of understanding the nature and wrongfulness of his actions. The Accused did not have a legal justification or excuse for using any controlled substances.

Really, I was in a terrible mental space and I was considering suicide at the time. When this happened, I didn't feel wanted or appreciated or valued at the unit and I kept getting into arguments with my first sergeant. I felt I had reached my limit and I made the poor decision to leave my unit, November 15th, 2022. I did not intend to return until I received a call and I was told I would be moved to a different troop. Once I heard that, I came back and turned myself in. But unfortunately, I continued to make poor decisions after I returned.

The military judge did not reopen the providence inquiry; neither party asked her to do so.

Based on *United States v. Hayes*, 70 M.J. 454 (C.A.A.F. 2012), the military judge erred by not reopening the inquiry to reevaluate whether appellant's guilty pleas were provident after he mentioned being "in a terrible mental space" and "considering suicide." In *Hayes*, our superior court established something of a sequential framework for this topic. First, did appellant set up matters inconsistent with guilt at any time during the proceeding? Second, if so, did the military judge respond with additional inquiry to assess whether such matters raised more than the mere possibility of a defense? In other words, if appellant makes that first step, the military judge must follow up.

*Hayes* also established that, depending on circumstances, the threat of suicide can amount to duress as a matter of law. Indeed the circumstances of appellant's case place that issue squarely before us. I recognize *United States v. Franks*, 76 M.J. 808 (Army Ct. Crim. App. 2017), where a fellow judge held that *Hayes* applied only where a person other than the accused was the subject of suicidal threat. Not only was the decision split thrice, but it is also less than clear whether this view – which narrowed a principle announced by our superior court - obtained a majority concurrence. By adopting the en banc suggestion, this court acting in full is now fortuitously able – and required – to revisit *Franks* and evaluate whether it was correctly decided.

In this case, two contrasting phases in the proceeding are dispositive: the providence inquiry and appellant's unsworn statement during sentencing. During the providence discussion, appellant's mention of "hostile work environment" was inconsistent with his guilty plea to desertion. However, in my view, the military judge handled this adequately – if somewhat colloquially – to ensure that appellant was not raising more than the mere possibility of a duress defense at that point. Appellant's later unsworn statement set up two new matters inconsistent with his guilty pleas generally – mental responsibility and duress. The stipulation's disclaimer is far from adequate on this point; instead, it raises questions about its scope and substance.

For these reasons, I believe the military judge erred by continuing to accept appellant's guilty pleas, resulting in prejudice. This causes me to briefly emphasize another basic flaw in the en banc majority opinion. My colleagues in the majority assert appellant experienced no prejudice, yet they decline to evaluate whether his guilty pleas were provident, whether he suffered legal harm as a result, and whether the poorly-explained delay aggravated that harm.

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court

# APPENDIX

# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
PENLAND, MORRIS, and ARGUELLES[1]
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Sergeant DAYTRON ABDULLAH**
**United States Army, Appellant**

ARMY 20230223

Headquarters, Fort Carson
Jacqueline L. Emanuel, Military Judge
Lieutenant Colonel Kenton E. Spiegler, Acting Staff Judge Advocate (pretrial)
Lieutenant Colonel Abraham L. Young, Acting Staff Judge Advocate (post-trial)

For Appellant: Colonel Philip M. Staten, JA; Major Mitchell D. Herniak, JA; Major Amanda Williams, JA (on brief); Colonel Philip M. Staten, JA; Lieutenant Colonel Autumn R. Porter, JA; Major Mitchell D. Herniak, JA; Major Amanda Williams, JA (on reply brief).

For Appellee: Colonel Christopher B. Burgess, JA; Lieutenant Colonel Jacqueline J. DeGaine, JA; Major Kalin P. Schlueter, JA, (on brief).

30 April 2024

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

ARGUELLES, Judge:

A military judge sitting as a special court-martial convicted appellant, pursuant to his pleas, of one specification of desertion, one specification of absence without leave, one specification of disobeying a superior commissioned officer, and one specification of wrongful use of marijuana in violation of Articles 85, 86, 90, and 112a, Uniform Code of Military Justice, 10 U.S.C. §§ 885, 886, 890, and 912a. [UCMJ]. Pursuant to the terms and conditions of the Plea Agreement, the military judge sentenced appellant to reduction to the grade of E-1, a bad-conduct discharge,

---

[1] Judge ARGUELLES decided this case while on active duty.

and confinement for 90 days.[2] The convening authority took no action on the findings and sentence.

The case is before this court for review pursuant to Article 66, UCMJ. Appellant raises one assignment of error, dilatory post-trial processing, which merits both discussion and relief.[3]

## BACKGROUND

After providing a urine sample in November of 2022, and knowing that it would test positive, appellant left his unit and texted his supervisor that "[a]fter yesterday I will no longer be coming in formation none of that. I'm done [ ] Do what y'all gotta do, I'm done." The day after appellant voluntarily returned to his unit in January, his troop commander ordered him not to leave the limits of Fort Carson or to drink alcohol. Several weeks later military police stopped appellant coming onto Fort Carson in an unregistered vehicle with expired license plates, no valid driver's license, no proof of insurance, and in possession of alcohol.

In February of 2023, knowing the command would deny his leave request, appellant went to Texas for five days without permission or authority to do so. After he returned and marijuana was discovered in his barracks room, appellant unsuccessfully attempted to flee from his escorts by running through his unit's operations facility and scaling a motor vehicle fence.

At sentencing, the Government offered into evidence appellant's Enlisted Record Brief, his Solider Talent Profile, and a General Officer Memorandum of

---

[2] Although the military judge discussed awarding appellant 51 days of pretrial confinement credit during the plea colloquy, when she announced her sentence on the record, she neglected to say anything about the pretrial confinement credit. The Statement of Trial Results, however, does correctly reflect an award of 51 days of pretrial credit. Appellant is not asserting that he did not receive this credit, but to the extent there is any confusion, we confirm that appellant's sentence should properly reflect the award of 51 days of pretrial confinement credit. *See United States v. McDonald,* ARMY 9900233, 2000 CCA LEXIS 330 (Army Ct. Crim. App. 13 Jul. 2000) (mem. op.).

[3] Block 31 of the Statement of Trial Results incorrectly states appellant suffered a conviction for a crime punishable by imprisonment for a term exceeding one year. We will exercise our discretion to correct this error. *See* Rule for Courts-Martial 1111(c)(2); *United States v. Pennington*, ARMY 20190605, 2021 CCA LEXIS 101, at *5 (Army Ct. Crim. App. 3 Mar. 2021) (summ. disp.) ("Exercising our authority under R.C.M. 1111(c)(2), we note and correct the following issues in appellant's post-trial documents . . . .").

2

Reprimand for a driving under the influence conviction he received in October of 2022. On the other hand, appellant called a number of witnesses, to include an investigator with the Fort Carson Criminal Investigation Division who testified about appellant's voluntary cooperation in another drug investigation without any promised benefit in return. Appellant also called a former team leader who described him by saying "[t]o this day, I have not had a soldier that I would say has been better performing than [appellant] was." This same witness also testified about how he worked with appellant in Hawaii, and explained that is where appellant met his wife, got married, and had a child. Although appellant's wife at the time claimed she would support his Army career and follow him to his next duty station, when the transfer orders to Fort Carson arrived, she instead remained in Hawaii and initiated divorce and child custody proceedings. Finally, appellant called his former boxing coach, as well as family members who offered compelling testimony as to his good character and "great" rehabilitative potential.

Appellant also gave an unsworn statement in which he took full responsibility for his actions and offered a heartfelt apology. Appellant explained how he attained the rank of E-5 in three years at his first duty station in Hawaii, and how after he got to Fort Carson with his family issues, "things started to fall apart in [his] career."

The Record of Trial (ROT) was 101 pages and took 164 days to process. This one-day trial took place on 20 April 2023, and the court reporter forwarded the ROT to the trial counsel for his review on 8 June 2023. Although the trial counsel completed his review the same day, the military judge did not receive the ROT for her certification until 11 September 2023, *96* days later. The military judge completed her review and certification 11 days later on 22 September 2023. The Office of the Staff Judge Advocate (OSJA) submitted a Post-Trial Processing Timeline memo ("memo") dated 27 September 2023 and signed by the Post-Trial Non-Commissioned Officer in Charge (NCOIC), which in total stated:

a. <u>Personnel Changeover and Experience</u>. The Post-Trial section received a new Staff Sergeant in April 2023. Between the months of April and August 2023, the civilian post-trial paralegal was tasked to train the new NCO within post-trial matters. Both Post-Trial team members are dually slotted in Magistrate Court and General Crime sections within the OSJA. All the above *may* have hindered the processing time for US v. Abdullah while balancing daily tasks within the other sections. (emphasis added).

b. <u>Operational Tempo</u>. There was an increase in court-martials between the months of May through August. The post-trial team worked diligently to meet all post-trial requirements for pending Courts-Martials as well as those that were back logged.

## LAW AND DISCUSSION

We review allegations of unreasonable post-trial delay de novo. *United States v. Anderson*, 82 M.J. 82, 85 (C.A.A.F. 2022) citing *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)).

Since at least 2002, the Court of Appeals for the Armed Forces (CAAF) has recognized that service level courts of appeal have two separate and independent avenues to provide relief for dilatory post-trial processing: (1) the Due Process Clause of the Fifth Amendment; and (2) the statutory basis under Article 66 when there is no showing of "actual prejudice." *See United States v. Grant*, 82 M.J. 814, 819 (Army Ct. Crim. App. 2022) ("Absent a due process violation, we still have authority under Article 66, UCMJ, to grant relief 'when appropriate under the circumstances'") (citing *United States v. Tardiff*, 57 M.J. 219, 224 (C.A.A.F. 2002)); *Toohey v. United States*, 60 M.J. 100, 101-02 (C.A.A.F. 2004) (holding the right to timely appellate review has both statutory roots under Article 66 and constitutional roots under the Due Process Clause).[4]

In *Toohey*, the CAAF adopted the four-factor balancing test from *Barker v. Wingo*, 407 U.S. 514 (1972), to determine whether the post-trial delay constitutes a due process violation: (1) length of the delay; (2) reasons for the delay; (3) the appellant's assertion of his right to a timely appeal; and (4) prejudice to the appellant. 60 M.J. at 102.

---

[4] Prior to the implementation of the Military Justice Act of 2016 (MJA 2016) in January 2019, Article 66(d)(1), UCMJ granted this court the statutory authority to "affirm only the sentence, or such part or amount of the sentence, as the Court finds correct in law and fact and determines, on the basis of the entire record, should be approved." The Military Justice Act of 2016 amended Article 66 to add a new section (d)(2), which provides in pertinent part that this court "may provide appropriate relief if the accused demonstrates error or excessive delay in the processing of a court-martial after the judgment was entered into the record . . . ." There is nothing, however, in the plain language of Article 66(d)(2) indicating or in any way suggesting that Congress sought to: (1) overrule *Toohey* or otherwise alter the use of the *Barker* test to analyze a Due Process claim as set forth below; or, (2) overrule CAAF precedent recognizing our discretion to afford relief under Article 66(d)(1). *See United States v. Gale*, ARMY 20230142, 2024 CCA LEXIS 128 at *3 (Army Ct. Crim. App. 21 Mar 2024) (summ. disp.) ("While Article 66(d)(2), UCMJ, concerns itself solely with delays after the entry of judgment, we continue to 'reject any argument that Article 66(d)(2), UCMJ, somehow cabins our broad and well-established sentence appropriateness authority under Article 66(d)(1), UCMJ, to provide relief for dilatory post-trial processing occurring at other phases of a court-martial.'") (*citing United States v. Brown*, 81 M.J. 507, 511 n.2 (Army Ct. Crim. App. 2021).

With respect to the length of the delay, in *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006), the CAAF established a presumption of reasonableness for post-trial processing where the convening authority took initial post-trial action within 120 days of trial, and the case was docketed with this court 30 days later. In light of the changes implemented by MJA 2016, we modified the *Moreno* timeline in *United States v. Brown* by holding that "this court will presume unreasonable delay in cases where more than 150 days elapse between final adjournment and docketing with this court." 81 M.J. 507, 510 (Army Ct. Crim. App. 2021). In *Brown* we also reiterated that "just as it was under the old procedures, staff judge advocates are advised to explain post-trial processing delays . . . ." *Id.* at 511.

In *United States v. Winfield*, issued one week after this case adjourned, we overruled *Brown*'s 150-day time limit, finding instead that some cases might justifiably take longer than 150 days to process for review, and that others should take significantly less time. 83 M.J. 662, 665 (Army Ct. Crim. App. 2023). Instead of imposing a bright-line time limit, we reaffirmed the requirement for an explanation as set forth in *Brown*, and held that in determining the reasonableness of the delay, "we will scrutinize even more closely the unit-level explanations for post-trial processing delays." *Id.* As we further explained in *Winfield*, "we are consistently interested to know about a case's transcript length, competing requirements (e.g., *actual* operational exigencies, in-court coverage), military judge availability, court reporter availability and utilization for transcription, and resource shortfalls (e.g., insufficient throughput capacity despite court reporter regionalization)." *Id.* at 666 (emphasis in original). Because this is a case that should have taken significantly less than 150 days to process, the length of the post-trial delay weighs heavily in favor of appellant.

Likewise, with respect to the purported reasons for the delay, we have continued to emphasize in both *Winfield*, and in a litany of subsequent unpublished decisions, that we expect the OSJA to provide a detailed explanation for any unwarranted delay. *See, e.g. United States v. Jefferson*, ARMY 20220448, 2023 CCA LEXIS 382 at *4 (Army Ct. Crim. App. 2023 6 Sep. 2023) (summ. disp.); *United States v. Brimmer*, ARMY 20210622, 2023 CCA LEXIS 253 at *5 (Army Ct. Crim. App. 9 Jun 2023) (summ. disp.); *United States v. Garrigus*, ARMY 20220259, 2023 CCA LEXIS 335 at *3 (Army Ct. Crim. App. 9 Aug 2023) (summ. disp.) ("Either way one looks at it - whether under *Brown* or *Winfield* - units owe an explanation for such slow post-trial action. When those who administer military justice in the field ignore binding precedent, we should not tolerate the resultant strain upon our system's credibility."); *United States v. Pulley*, ARMY 20220494, 2023 CCA LEXIS 289 at *2 (Army Ct. Crim. App. 6 Jul. 2023) (summ. disp.).

As such, we are highly troubled that once again, the purported explanation in this case falls far short of justifying or explaining why it took over three months to transfer a 101-page ROT from trial counsel to the military judge.

First, the memo does not even address, much less make any effort to give a specific reason for, the unacceptable 96-day delay. Instead, in two very short paragraphs it generally describes how the post-Trial section received a new NCO that needed training, and that the team was double-slotted in the Magistrate Court and General Crime sections, before stating "all of the above *may* have hindered the processing time" in this case. The memo then concludes with a second paragraph describing "an increase in court-martials [sic] between the months of May through August," and that the trial team worked diligently to meet its obligations. Unfortunately, the memo provides no specific numbers which would allow us to meaningfully gauge how many courts-martial were processed at Fort Carson in the summer of 2023. Nor does it make any reference to reaching out to other installations either within or outside the circuit for help in addressing the "backlog."

To say the memo falls far short of this court's firmly established requirements is an understatement. As such, the second *Barker* factor, the reasons for the delay, weighs heavily in favor of appellant. *See United States v. Arriaga*, 70 M.J. 51, 57 (C.A.A.F. 2011) ("[P]ersonnel and administrative issues, such as those raised by the Government in this case, are not legitimate reasons justifying otherwise unreasonable post-trial delay"); *Winfield,* 83 M.J. at 665-66 ("Staff judge advocates who decline to memorialize delays with thorough, credible, and relevant specificity do so at the peril of their units' cases on appeal"); *United States v. Jackson*, 74 M.J. 710, 719 (Army Ct. Crim. App. 2015) (rejecting the government's explanation for the delay based on "court reporter shortages and high number of cases tried"); *United States v. Canchola*, 64 M.J. 245, 247 (C.A.A.F. 2007) ("However, a general reliance on budgetary and manpower constraints will not constitute reasonable grounds for delay nor cause this factor to weigh in favor of the Government.")

Along the same lines, and further highlighting the OSJA's apparent lack of interest in addressing and fixing these recurring post-trial delay issues, is the fact that preparation of the memo in this case was delegated all the way down to the E-6 level. An SJA may delegate authority to write such a document for submission to this court, but they remain responsible for its content.

As to the third *Barker* factor, because appellant did not assert his right to a timely appeal, this factor weighs in favor of the government.

In assessing the fourth *Barker* factor of prejudice, we consider three sub-factors: "(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired." *Moreno*, 63 M.J. at 138-39, quoting *Rheuark v. Shaw*, 628 F.2d 297, 303 n.8 (5th Cir. 1980). The first sub-factor is directly related to the success or failure of appellant's substantive appeal, and the second sub-factor requires appellant to show particularized anxiety that is distinguishable from the normal anxiety of

6

waiting for an appellate decision. *Id.* at 139-40. Applied in this case, because appellant does not raise any substantive issues on appeal other than post-trial delay, and has not demonstrated any "particularized" anxiety, the fourth *Barker* factor also weighs in favor of the government.

When there is no finding of prejudice under the fourth *Barker* factor, as is the case here, a due process violation only occurs when "in balancing the three other factors, the delay is so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." *Anderson*, 82 M.J. at 87 citing *Toohey*, 63 M.J. at 362. This is yet another such a case.

While we recognize that this court has not granted relief for similar delays in other cases, given the unique facts and circumstances of this case, to include the very strong sentencing case put on by appellant and the fact that the offenses at issue do not have any identifiable individual victims, we find that because the government's continued, blatant violation of our well-established precedent adversely affects the "public's perception of fairness and the integrity of the military justice system," relief is justified under the Due Process Clause. *See Toohey*, 63 M.J. at 362. For all of the same reasons, the post-trial delay was not harmless beyond a reasonable doubt. *See United States v. Allison*, 63 M.J. 365, 371 (C.A.A.F. 2006) ("In determining whether relief is warranted for a due process denial of speedy review and appeal, we will consider the totality of the circumstances in the particular case.").

For all of the same reasons, we find relief is also warranted under Article 66(d)(1).

## CONCLUSION

Upon consideration of the entire record, the finding of guilty is AFFIRMED. Only so much of the sentence extending to confinement for ninety days is AFFIRMED. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of his sentence set aside by this decision are ordered restored.

Senior Judge PENLAND concurs.

MORRIS, Judge, dissenting in part.

I agree with my colleagues that the post-trial delay, specifically the unexplained 96 days the government took to forward the record from the trial counsel to the military judge, was excessive. However, I would not find a violation of the Due Process Clause of the Fifth Amendment, because appellant failed to assert any prejudice and I do not find the delay so egregious that tolerating it would

7

adversely affect the public's perception of the fairness and integrity of the military justice system. *U.S. v. Anderson*, 82 M.J. 82, 87 (C.A.A.F. 2022) (citing *Toohey*, 63 M.J. at 362). When factoring in the timing of this case, which adjourned prior to this Court's decision in *Winfield*, the government's slow processing is less blatant disregard of precedent, than it is an indication they were slow to implement the necessary changes to their post-trial processes. On the basis of the entire record, factoring in the serious offenses and the failure to assert any prejudice, I find the sentence appropriate and would not grant any sentencing relief, and therefore I dissent in part.

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court